Toomey, J.
Introduction
After juxy-waived trial, at which was presented documentary, video and testimonial evidence, I find and rule that judgment shall enter on the claim, for the plaintiff, in the amount of $57,850.97, and on the counterclaim for the plaintiff (defendant-in-counterclaim). Plaintiffs recovery shall not include interest. Findings of fact and rulings of law appear more specifically infra.
Background
As Certified Public Accountants of superior competence and unchallenged ethics, Joseph Rosenberg and Bruce Carlin saw value in the creation of a partnership by which they would practice the profession of accounting. Accordingly, in 1983, they formed the firm of Rosenberg and Carlin, and by all accounts, the business flourished. The partners were content and the clients were well served. By 1987, however, Joseph Rosenberg, substantially the elder of the partners, became interested in reducing his professional activities and elected to withdraw from the partnership.
Both Joseph Rosenberg and Bruce Carlin approached the task of dissolving their partnership from the direction of cordiality and with the purpose of a fair, mutually acceptable distribution of the firm’s assets. They drafted a Withdrawal Agreement (“W.A.”), and, on April 30, 1988, signed it. <
Attached to and incorporated within the WA. was a promissory note by which Bruce Carlin promised to pay Joseph Rosenberg $150,000 on or before April 30,1991. It is undisputed, however, that the $150,000 figure was intended by the parties to be an approximation of the value of the capital account due to Joseph Rosenberg and that the parties expected to adjust the figure consistent with their later ascertainment of the precise absolute value of said account (WA. ¶1(5)).
Notwithstanding the uncertainty of the absolute value of Joseph Rosenberg’s capital account, Bruce Carlin had made, by December 1989, nineteen monthly payments (totaling about $90,000) in compliance with the promissory note. He then tendered a $43,000 check to Joseph Rosenberg. The check represented Carlin’s determination of the difference between the amounts theretofore paid and the absolute value of the Rosenberg capital account. Rosenberg, disputing the Carlin assessment of the absolute value of the capital account, did not cash the check. Carlin maintained funds in the drawee bank sufficient to cover the check, at least through July 1990, when the instant complaint was entered.
The Pleadings
Rosenberg’s complaint presented five causes of action against Carlin and the latter’s incorporated entily:
Count I: Breach of Contract — failure to pay the entirety of the $150,000 note.
Count II: Breach of Contract — transfer of assets to the incorporated entity.
Count III: Breach of Contract — employment of Carlin by the incorporated entity.
Count IV: Accounting — seeking a judicial determination of the amount of the capital account due to Rosenberg.
Count V: Willful, Unfair or Deceptive Trade/Commerce Practices — G.L.c. 93A.
Carlin’s counterclaim against Rosenberg tendered three allegations:
Count I: Breach of Contract — asserting that Rosenberg failed to adjust the note and refused to accept the proffered payment of the balance due of the Carlin adjusted note.
Count II: Breach of Fiduciary Duty — claiming that Rosenberg’s discharge of his obligations as partner was actionable.
Count III: Willful, Unfair or Deceptive Trade/Commerce Practices — G.L.c. 93A.
Through various concessions, agreements and stipulations, occurring both before and during trial,[3] the parties have winnowed the reciprocal accusations into a single dispute which may be articulated as follows:
Rosenberg asserts that the capital account should be valued by depreciating the capital leases (for office supplies and equipment as to which Rosenberg and Carlin was the lessee) over ten years, resulting in a remainder, after the deduction of the approximately $90,000 already paid, of $57,850.97 (plus interest) owed to Rosenberg.[4] Carlin responds that the capital account should be valued by depreciating the capital lease over the period of the term of each lease resulting in a remainder due Rosenberg of $39,535.96.
For the reasons stated below, this court finds that Rosenberg has the better of the argument with respect to the method of depreciation required by, inter alia, the WA., but fails in his claim for interest due as a result of Carlin’s termination of scheduled payments in December 1989.
*185 ANALYSIS
We start with the proposition that the W.A. required that “generally accepted accounting principals” (“GAAP”), control the ascertainment of the value of Rosenberg’s capital account (W.A. ¶1(a)). Application of GAAP requires reference to the Current Text of the Financial Accounting Standards Board (“FASB”). That text, appearing in FASB L10,[5] provides a number of considerations to guide the determination of which depreciation method is to be employed in valuing a capital account containing capital leases. Those considerations include §. 107(a) (p. 29148)[6] which mandates that, if the leases contain bargain purchase options, amortization is to be accomplished by means of the depreciation method normally used by the lessee with respect to the lessee’s owned assets. Because Rosenberg and Carlin’s normal depreciation policy, with respect to its owned assets, implicates a ten-year period, a ten-year period must be employed with respect to the capital leases at bar, if said leases include “bargain purchase options” as defined by FASB L10 §.401 (p. 29241).[7] Our task then, is to determine whether the capital leases at issue[8] did or did not contain bargain purchase/renewal options.
We know, from FASB L10, §§.401 and .402 (p. 29241), that the purchase/renewal option of a capital lease is a “bargain” purchase/renewal option if the lease contains
a provision allowing the lessee, at the lessee’s option, to purchase [or renew the lease of] the leased property for a price that is sufficiently lower than the expected fair value of the property at the date the option becomes exercisable that the exercise of the option appears, at the inception of the lease, to be reasonably assured.
The question at bar becomes, therefore, whether the costs of exercising the options were, upon the date set for exercise, so substantially less than the then value of the property that, from the vantage of the inception of the lease, the exercise of the options seemed reasonably likely to occur. The court concludes that the question is to be answered in the affirmative.
Having employed the judicial time machine mandated by FASB L10 §§.401 and .402 (p. 29241), the court is persuaded that the vista, from the inception dates of the leases to the dates of exercise of the options, portrays the costs of the exercise of the options as significantly lower than the expected value of the property to which the options pertain. Consideration of the credible testimonial and documentary evidence offered at trial strongly suggests that the cost of exercising the options would be dramatically less than the fair value of the property at the end of the lease term. The nature of the properly and the character of the business of Rosenberg and Carlin were such that the property was not likely to have suffered hard use and ought not to have deteriorated physically to any significant degree. The property was of a kind thatwould remain useful to its possessor notwithstanding technological advances or the arrival on the market of more sophisticated versions of the property. In sum, at the time of the inception of the leases, the property generally would be expected to retain substantial value, at the time of the exercise of the options, value well in excess of the purchase/renewal costs specified in the leases. Given that distance — between a relatively high expected value and a relatively low expected cost of exercise — the lessee’s election to exercise the options was, when viewed from the vantage of the circumstances extant at the exception of the leases, “reasonably assured.” FASB L10 §§.401 and .402.
Because of that reasonable assurance, the capital leases will be found to contain “bargain purchase” options within FASB L10 §. 103(b) (p. 29146). As such, they are to be “amortized in a manner consistent with the lessee’s normal depreciation policy for owned assets.” FASB L10 §. 107(a) (p. 29148). The “normal depreciation policy” of Rosenberg and Carlin employed, as a matter of historical fact and without objection by the partners, a ten-year method. Consequently, the ten-year method will be employed at bar to measure the value of the instant capital leases and to determine the amounts due to Joseph Rosenberg as a result of his capital account share.
CONCLUSION
The parties having stipulated that, if the court finds that the ten-year depreciation method is to be employed in valuing the capital lease aspects of Joseph Rosenberg’s capital account, the value of said leases is $57,850.97, this court will enter judgment, on Counts I and IV of the complaint, for plaintiff in that amount.[9] Judgment shall also enter for plaintiff (defendant-in-counterclaim) on Counts I and II of the Counterclaim.

 At trial, the parties voluntarily dismissed Counts II, III, and V of the claim and Count III of the counterclaim.

 Rosenberg also maintains in the alternative, that, if the Carlin “life of the lease” method of depreciation is favored by this court, the deprecation should be calculated using “life of lease plus option terms of each lease” method-, resulting in a remainder due Rosenberg of an amount less than $57,850.97 but more than $39,535.96. The precise amount due under this theory need not be calculated because the court does not accept the alternative suggestion.

 The text was received into evidence as Exhibit 3.

 Page references are to the versions of FASB L10 appearing in Exhibit 3.

 Similar analysis applies in the event of “bargain renewal options” as defined by FASB L10 §.402 (p 29241).

 The leases were received into evidence as Exhibit 4.

 Insofar as plaintiff seeks interest by reason of the $43,000 check tendered by defendant in December 1989, but unsupported by sufficient funds in the payor bank after July 1990, the court finds that plaintiff has not established, by a preponderance of the evidence, his entitlement to interest upon the amount now found to be owed to him by defendant. Accordingly, no prejudgment interest will be awarded to plaintiff.